# Wytheville

OLLIE WILSON COXE v. PHILIP AUGUSTUS COXE.

June 22, 1944.

Record No. 2806.

Present, All the Justices.

The opinion states the case.

*Charles E. Maurice*, for the appellant.

No appearance for the appellee.

EGGLESTON, J., delivered the opinion of the court.

This appeal involves the sufficiency of the evidence taken by depositions to sustain a decree of divorce *a vinculo* granted to Philip Augustus Coxe, on the ground of desertion, in a suit filed by him against his wife, Ollie Wilson Coxe.

The parties are members of the colored race and were married on May 11, 1937. The husband was then thirty-three years of age and the wife twenty-eight. He was born in Carlisle, Pennsylvania, and educated as a "commercial artist." She was born in Cumberland county, Virginia, and is a registered trained nurse.

Immediately after the marriage the couple went to live at the wife's former home in Cumberland county. Within a few months the husband's mother, who had been living in Pennsylvania, took up her residence with the couple. She brought to the home her furniture and aided materially in furnishing the house and in purchasing farming equipment. Except for limited farming operations, and an occasional day's work, the husband was not employed, and the couple had no income. It was necessary that the wife go to work and she obtained employment at a hospital at Farmville in the adjoining county. After working there for about a year she secured a better position at the Central State Hospital at Petersburg. The wife's earnings were applied to the support of the home in Cumberland county which she visited regularly at week ends. While she was away from home her mother-in-law kept house and did the necessary incidental work.

In June, 1939, the couple and the husband's mother moved to Richmond, maintaining a home first on Leigh street and later on Langston avenue. The latter property the husband and wife undertook to purchase by instalments in their joint names. Before leaving Cumberland county the husband had obtained employment at a "C. C. C. Camp" there, where he lived until December, 1940, when he took up his residence in Richmond. In the meantime both he and his wife spent their week ends at their Richmond home, to the upkeep of which she continued to contribute.

By the spring of 1940 friction had developed between the wife and her mother-in-law, and, as is often the case, this led to trouble between the husband and the wife. The wife was still employed at Petersburg, but came home for the week ends. She insisted that she should not be required to live in the house with her mother-in-law, while the latter declined to move until she had been reimbursed for the money and property which she had loaned the couple. The husband upheld his mother and this, of course, made matters worse.

·The husband testified that in May of that year his wife deserted and abandoned the Richmond home and moved her clothes and belongings to Petersburg where she was then working. While he says that during the two following years she occasionally returned home and spent the night there, he further says that she never in fact resumed her residence at the home or her marital relations with him. In the main his testimony is corroborated by that of his mother, but is contradicted by that of the wife.

This alleged act of desertion is the basis of the suit which the husband filed against his wife in January, 1942, in which he prayed for a divorce *a mensa*. She answered, denying the desertion. On May 28, 1942, he filed an amended and supplemental bill, alleging that the desertion had continued for a period of two years, and that, therefore, he was entitled to a divorce *a vinculo* under Code, section 5103, as amended by Acts 1926, ch. 517, p. 868, Acts 1934, ch. 23, p. 20. The lower court took the view that the allegation was sufficiently proven and granted the husband a decree *a vinculo*.

In her petition for appeal the wife, while admitting the friction between her and her mother-in-law, insists that she (the wife) did not desert her husband or abandon her home at the time alleged, or at any other time. She contends that despite the unpleasant relationship between her and her mother-in-law, and the indifference of her husband, she has nevertheless maintained and continued her residence at the home, which she and her husband were purchasing, down to the inception of the present suit, and that such interruption

as there was of the marital relations was due entirely to his fault and not to hers.

A careful consideration of the evidence convinces us that the contention of the wife is right. While the husband contends that she abandoned the home in May, 1940, it will be recalled that at that time she was employed at the Central State Hospital in Petersburg, and he was employed at the "C. C. C. Camp" in Cumberland. Neither was able to return home except at week ends. He admitted that so long as his employment in Cumberland continued, that is, from May, 1939, to December, 1940, his wife visited the home as frequently as he did.

There are numerous occurrences related in the evidence, both by the husband and his mother, which bear out the wife's contention that she kept up her regular visits to the home after the date of the alleged desertion, in May, 1940. For instance, in November, 1940, the husband's mother, while visiting a daughter at Johnson City, Tennessee, wrote her son a letter urging that he allow his wife to stay in the home but that he "pay no attention to her," and that if he ignored her (the wife) she would "tire soon" and "return to Petersburg." Why the pertinency of such advice if the wife had already left home?

Again, according to the testimony of the husband, in December, 1940, he made plans to rent the Langston avenue home and take a smaller house at Highland Springs. He says that he discussed the subject with his wife but she was unwilling to make the change, and that thereupon he abandoned the plan and they returned to the home on Langston avenue.

On June 1, 1941, the wife gave up her position in Petersburg and obtained employment at St. Philip Hospital in Richmond. While the evidence shows that her duties required that she spend most of her nights at the nurses' dormitory adjacent to the hospital, yet she spent two or three nights a week at home. Even the mother-in-law admitted that during this time the wife "came home about like she always did,—occasionally," carrying out approximately

the same schedule which her son did when he was employed at the "C. C. C. Camp." .

On August 13, 1941, an altercation occurred between the husband and the wife, during which each claimed that he or she was struck by the other. It is a fair inference from the evidence that the presence of the mother-in-law in the home was the cause of this quarrel and that it occurred in the couple's bedroom at their home.

There were two bedrooms in the house, one of which was at first occupied by the husband and the wife and the other by the husband's mother. The evidence shows that when the husband's mother left home. in the fall of 1940, she locked the door to her bedroom and took the key with her, making it necessary for the husband to enter the room by a passkey in order to give his wife access thereto.

At other times, after the mother-in-law had returned, when the wife came home from work, she (the wife) was locked out of both bedrooms and was compelled to sleep on a couch in the living room. The husband admits this. He further corroborates his wife's testimony that as a result of his action in barring her from his bedroom she instituted proceedings against him in the Juvenile and Domestic Relations Court in November, 1941.

All of these circumstances, we think, clearly indicate that the wife had not abandoned her home in May, 1940, as alleged by her husband, but was insisting on her rights therein down to the very inception of the divorce proceeding. Indeed, in the memorandum for process filed in the clerk's office on January 8, 1942, the address of the wife is given as "2411 Langston Avenue, Richmond, Virginia," and the sergeant's return showed that the process was served on her there by being "posted on the front door of her residence, 2411 Langston Avenue, that being her usual place of abode."

The wife insists that all the while she contributed to the purchase and upkeep of the home. The husband denies this but offered no evidence to show how these expenses were met. Except for the time that he was employed at the "C. C. C. Camp," from the spring of 1939 to December,

1940, there is no evidence that he had any income. On the other hand, she has been employed with a fixed income since shortly after the marriage. Moreover, the record further shows that even during the taking of the depositions in the present proceeding the husband and his mother abandoned and vacated the home, and that the wife made the necessary arrangments to take care of the future payments and save the property from foreclosure.

On the whole we are of opinion that the record fails to show that the wife was guilty of desertion, as alleged by her husband. Accordingly, the decree appealed from is reversed and the original bill and the supplemental bill of the husband are dismissed.

*Reversed and final decree.*